IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HALGER M. POTTER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 03-04735 |
| | : | |
| v. | : | |
| | : | |
| DEPUTY ATTORNEYS UNDER | : | |
| LYNN ABREHAM,[1] et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Giles, J.                                                    February 11, 2008

I.      **INTRODUCTION**

Before the court are Defendants Dr. David Derose ("Dr. Derose") and Fran Tkach's

("Tkach") Motions for Summary Judgment.[2] Pro se Plaintiff, Halger M. Potter, brings his cause

of action pursuant to 42 U.S.C. § 1983, raising allegations of inadequate prison medical care.

Plaintiff's allegations are based on a constitutional violation of his Eighth Amendment right to be

free from cruel and unusual punishment,[3] made applicable to the states through the Due Process

Clause of the Fourteenth Amendment.  See Robinson v. California, 370 U.S. 660, 666-67 (1962).

Prison officials violate the Eighth Amendment's prohibition against cruel and unusual

---

[1] The correct spelling is "Lynne Abraham."

[2] Defendant Fran Tkach is also known as "Lab Technician Fran," "Lab Tec. Fran," and "Lab Tech. Fran."

[3] The Eighth Amendment states in full: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

-1-

punishment when they act deliberately and indifferently to the serious medical needs of prisoners in their custody. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976).

The two issues raised by Defendants' motions for summary judgment and determined by this court are: (1) whether Plaintiff has properly exhausted the three-tiered prisoner grievance system, as required by 42 U.S.C. § 1997e(a); and (2) whether Plaintiff has set forth evidence showing that there is a genuine issue of material fact as to his allegations of deliberate indifference to serious medical need.

This court grants both Defendants' motions for summary judgment. First, Defendants' motions are granted because Plaintiff has failed properly to exhaust the three-tiered prisoner grievance system. Second, in the alternative, Defendants' motions are granted because Plaintiff has failed to demonstrate that there is a genuine issue of material fact as to either Defendant's alleged deliberate indifference to serious medical need. Plaintiff has produced no evidence, direct or circumstantial, supporting his allegations. After thorough review of Plaintiff's motions and affidavits, it is evident that the Plaintiff has merely reasserted the factually unsupported allegations contained in his pleadings. Summary judgment is proper because the evidence adduced does not produce a genuine factual dispute on any material issue ordinarily decided by a jury.

## II.   **PROCEDURAL HISTORY**

On September 30, 2003, Plaintiff filed his Complaint against Defendants Dr. Derose and Tkach, as well as other defendants who have since been dismissed from this case. On September 29, 2004, this court granted Defendants' Deputy Attorneys under Lynne Abraham, c/o

Wickersham, SCI Frackville, and Mary Lu Snowalter Motions to Dismiss. On October 14, 2004, Plaintiff timely appealed. On August 15, 2005, the Court of Appeals for the Third Circuit dismissed the foregoing appeal for lack of appellate jurisdiction. Dr. Derose and Tkach are the sole remaining Defendants.[4]

On May 31, 2006, Tkach filed a Motion to Dismiss, which was denied on June 14, 2006 because Plaintiff established through his pleadings that he may be entitled to relief. On June 27, 2006, Tkach filed an Answer and affirmative defenses to the Complaint. On August 22, 2006, Plaintiff filed an interlocutory appeal. Pending Plaintiff's interlocutory appeal, the matter had been stayed. On October 5, 2006, Dr. Derose filed an Answer to the Complaint. On March 22, 2007, the Court of Appeals for the Third Circuit denied Plaintiff's appeal because the District Court's order was not a final appealable order. On May 7, 2007, Plaintiff filed an "Affidavit."

On June 11, 2007, Tkach filed a Motion for Summary Judgment. On June 13, 2007, this court held a pretrial conference, with Defendants Dr. Derose and Tkach present and with Plaintiff present via video conference. At the pretrial conference, Dr. Derose announced his intention to file a motion for summary judgment. The court ordered Plaintiff to respond respectively to Defendants' motions for summary judgment within sixty days of service.

On June 21, 2007, Plaintiff filed a Motion for Rebuttal and Memorandum of Law. On June 25, 2007, Dr. Derose filed a Motion for Summary Judgment. On June 25, 2007, Plaintiff filed an Amended Brief in Support of a Motion for Rebuttal. On July 2, 2007, Plaintiff filed a

---

[4] One other defendant, "C/O Bruse," is listed in the Complaint. On January 29, 2004, summons was returned unexecuted as to C/O Bruse. No further action has been taken as to C/O Bruse in the past four years. The above-captioned matter is therefore dismissed for want of prosecution as to Defendant Bruse.

Motion for Objection to the Summary Judgment Motions.  On July 16, 2007, Plaintiff filed an Amended Brief in Support of his Motion for Objection to the Summary Judgment Motions.  On August 24, 2007, Plaintiff filed a Supplemental Objection.[5]

In addition to Eighth Amendment claims, Plaintiff asserts that Dr. Derose and Tkach committed medical malpractice and negligence, based on state-law.  (Pl.'s Am. Br. Supp. of Mot. for Obj. 6.)  These claims are not cognizable because Plaintiff did not include them in his Complaint.  This court's subject matter jurisdiction is anchored in Plaintiff's federal 42 U.S.C. § 1983 deliberate indifference to serious medical need cause of action.  Mere allegations of medical malpractice do not state a deliberate indifference claim.  Accordingly, because Plaintiff did not plead in his Complaint state-law malpractice or negligence claims, or supplemental jurisdiction, this court does not reach the state-law allegations.

## III.   FACTS

### A.   Allegations Against Dr. Derose

Plaintiff alleges the following facts in his Complaint and sworn statements to the court in his motions and pleadings, which, consistent with Fed. R. Civ. P. 56, are viewed in the light most

---

[5] Plaintiff asserts that he has thirty-three exhibits that he would like to fax to this court, before a decision is made on Defendants' motions for summary judgment. (Pl.'s Mot. Rbttl. 5; Pl.'s Suppl. Obj. 5.) Plaintiff asserts that he cannot pay for postage and asks that the court request that the exhibits be faxed to Judge Giles' chambers. (Id.) Plaintiff argues that Defendants' access to fax and electronic email, while he does not enjoy such access, is evidence that there is a material issue of dispute. (Pl.'s Mot. for Obj. to Mot. Summ. J. 19.) It would be improper for this court to order the State Correctional Institute at Huntingdon to allow Plaintiff to use the prison fax machine. Furthermore, any faxed papers would not be of record. Plaintiff must properly file potential exhibits for this court to consider the content of any document. Plaintiff's request that the court order that his exhibits be faxed is denied.

favorable to him.  Plaintiff is presently an inmate at State Correctional Institute Huntingdon,

Pennsylvania ("SCI Huntingdon").  (Pl.'s Compl. 1.)  Although it was difficult to discern pro se

Plaintiff's facts and legal conclusions from his numerous and disorganized handwritten

pleadings, this court carefully considered all of the documents filed by Plaintiff.[6]

---

[6] Plaintiff's Complaint has been construed in the light most favorable to him.  However, some claims in his Complaint and many assertions in his subsequent submissions are not directed against Defendants Dr. Derose and Tkach and therefore are not cognizable.  The assertions in his subsequent submissions were made after the dismissal of the other defendants.  Plaintiff may only assert claims against the remaining Defendants, Dr. Derose and Tkach.  Because Plaintiff has failed to show that the named Defendants have been personally involved in the events which underlie the following assertions, this court does not reach them.  To assist any reviewer of the record, the court sets forth below the unconnected, incognizable, and spurious assertions found in Plaintiff's rambling pro se attempts to resist Defendants Derose and Tkach's summary judgment motions.

Plaintiff asserts that he was bitten by rodents several times while incarcerated at SCI Huntingdon.  (Pl.'s Aff. 3.)  After the rodent bites, Plaintiff allegedly suffered flu-like symptoms.  Plaintiff allegedly did not receive medication and, as a result, had been "spitting foam." (Id.)  Plaintiff also asserts that "Dr. Olga" and "Dr. Kozack" infected him during a blood test, and after a routine dental check Plaintiff suffered an infection.  (Id.)  Since the above-mentioned assertions do not concern Dr. Derose or Tkach, this court does not address them.

Plaintiff further asserts that, pursuant to a retaliatory plan to torture Plaintiff because of his lawsuit, prison employees continually place harmful substances in his food.  While administering Plaintiff's food tray, a prison guard allegedly said "that is the guy that is suing us." (Pl.'s Am. Br. Supp. of Mot. for Rbttl. 5.)  After eating the food, Plaintiff allegedly suffered abdominal and bladder infections.  (Id.)  Plaintiff asserts that he has lost sixty-nine pounds over twelve years of imprisonment, due to food contamination.  (Pl.'s Compl. App. 3.)  Plaintiff asserts that he now weighs one hundred and thirty pounds.  (Pl.'s Am. Br. Supp. of Mot. for Rbttl. 4.)

Expanding upon the above-mentioned alleged retaliatory actions, Plaintiff asserts that the medical staff's refusal to administer a CT-Scan demonstrates a premeditated murder conspiracy.  (Pl.'s Am. Br. Supp. of Mot. for Rbttl. 8.)  Throughout his pleadings, Plaintiff's repeatedly requests a CT-Scan.  Plaintiff asserts that a CT-Scan would show the existence of a brain tumor and substantiate his lawsuit against Dr. Derose and Tkach, notwithstanding issues of medical and legal causation between the alleged botched blood test and the alleged brain tumor.

Plaintiff also asserts that he has suffered property damage and theft while at SCI Frackville and SCI Huntingdon.  Plaintiff asserts that a thief stole two boxes of legal material from the Justice Center's Office.  (Pl.'s Compl. 3-4.)  The stolen boxes supposedly were meant to be sent to Judge Giles.  (Id. at 3.)  After this incident, Plaintiff asserts that his files are now incomplete.  (Id.)  In addition to the alleged legal documents theft, Plaintiff asserts that a cell bag

In his Complaint, Plaintiff alleges that while he was imprisoned at State Correctional Institute Frackville ("SCI Frackville") he suffered an eye injury. He alleges that Dr. Derose, an optometrist, intentionally attempted to blind him. (Pl.'s Compl. 3, § b.) Plaintiff contends that he requested to see an eye doctor to have a glaucoma test administered. (Pl.'s Compl. App. 3.) In subsequent pleadings, he asserts that he did not request or consent to the glaucoma test. (Pl.'s Mot. for Obj. to Mot. Summ. J. 12). At the pretrial conference held on June 13, 2007, Plaintiff stated that he was not having eye trouble prior to the glaucoma test. Rather, the meeting with the eye doctor was a routine check because he was a new arrival at the prison. During the examination, Dr. Derose allegedly performed an eye dilation test. (Pl.'s Compl. 3, § b.) At the pretrial conference held on June 13, 2007, Plaintiff stated that during the test Dr. Derose tilted Plaintiff's head back, checked his eyes with a light, and then "shot" drops into his eyes.

Defendants have provided a comprehensive compilation of medical and general prison records on Plaintiff. Throughout the medical records submitted by Defendants jointly, various doctors and physician assistants state that Plaintiff exhibited "inappropriate health seeking behavior" and a "food phobia" stemming from Plaintiff's "chronic paranoid schizophrenia." (Defs.' Ex. C, Doc. 62-16 at 15; see also id. at 35, 38, 39; Defs.' Ex. C, Doc. 62-17 at 3-4, 6, 29, 32; Defs.' Ex C, Doc. 62-18 at 3 (opining that weight loss related to psychiatric condition); id. at 6 ("This Patients [sic] problem is mainly psychiatric.").)

---

containing legal papers, personal letters, photographs, and cosmetics was stolen from him. (Id. at 4.)

The above-mentioned allegations are not factually or legally related to Plaintiff's 42 U.S.C. § 1983 cause of action of deliberate indifference to serious medical need brought against Dr. Derose and Tkach, and therefore are not cognizable. Accordingly, this court does not reach any of Plaintiff's above-mentioned assertions.

In an affidavit, Dr. Derose stated that, on or about July 24, 2001, he administered a routine glaucoma test on Plaintiff. (Defs.' Ex. A, Doc. 71 at 27.) Dr. Derose stated that the procedures used during Plaintiff's glaucoma test were identical to those performed by Dr. Derose on thousands of other occasions, with no known difficulties. (Id.) He further stated that a routine glaucoma test involves administering Floress eye drops, a dye to facilitate the viewing of the cornea. (Id.) Dr. Derose stated that Plaintiff's test revealed that he had normal intraocular pressure and no acute issues requiring continued care by Dr. Derose. (Id. at 28.) Other than Dr. Derose's sworn affidavit, there is no evidence of the glaucoma examination itself in Plaintiff's medical records. However, because there is no dispute that the glaucoma test occurred, this court concludes that the eye examination had to have been a routine test.

Plaintiff claims that, during the glaucoma test, Dr. Derose caused him to suffer a severe eye injury when Dr. Derose allegedly placed a harmful bacteria substance in his eye. (Pl.'s Compl. 3, § b.) Plaintiff's claims that his eye began to swell shut. (Id.) Thereafter, Plaintiff claims that he suffered blurry vision. (Id.)

In Dr. Derose's affidavit, he states that any adverse reaction that Plaintiff may have suffered as a result of the glaucoma test was unknown to him, because of the established protocol for sick call. (Defs.' Ex. A, Doc. 71 at 28.) At the correctional facility, the sick call protocol states: "(1) an inmate within restrictive housing [must] notify the appropriate correctional personnel of their medical condition; (2) inmates are then seen in sick call by the infirmary medical personnel, that being the physician on call, the physician's assistant on call, or the nurse on call; and (3) when appropriate, the inmate is placed on the list to be seen by the necessary specialist." (Id.)

Medical records produced by Defendants show that on July 25, 2001, the day after the glaucoma test, Jessica Hoch, PA-C ("Hoch") examined Plaintiff. (Defs.' Ex. C, Doc. 62-16 at 19.) Hoch's Progress Notes document that Plaintiff complained of blurry vision, burning eyes, and that the eye drops were affecting him negatively. (Id.) On July 27, 2001, Hoch diagnosed Plaintiff as having conjunctivitis. (Defs.' Ex. C, Doc. 62-17 at 23.)

At the pretrial conference held on June 13, 2007, Plaintiff stated that a weekend doctor thereafter gave him a small tube of what Plaintiff described as "mineral oil." He stated that he used the mineral oil and his eye felt better. He stated that the prison staff then took the tube away. Plaintiff stated that when the prison officials brought the tube back, it was unsealed and that the oil burned when he applied it to his finger. Plaintiff stated that he determined that the mineral oil might harm him and decided not to use it on his eyes. Plaintiff also stated that there was no antibiotic in the ointment.

At the June 13, 2007 pretrial conference, Plaintiff stated that an inmate named "Rivera" gave him pills called "Bactrum," an antibiotic allegedly prescribed to Rivera for a urinary tract infection. Plaintiff stated that he crushed up the pills and applied Rivera's medicine directly to his own tear ducts. Plaintiff stated that, following this, his eye condition improved. He believes that he would have gone blind but for the Bactrum pills.

In Dr. Derose's affidavit, he opined that, in his medical opinion, within a reasonable degree of medical certainty, Plaintiff caused his conjunctivitis himself by placing Bactrum granules directly into his eyes. (Defs.' Ex. A, Doc. 71 at 29.) The medical opinion is unrebutted.

Medical records provided by Defendants reveal that, on August 8, 2001, Maria Braskie, PA-C ("Braskie"), examined Plaintiff. (Defs.' Ex. C, Doc. 62-16 at 20.) He complained of pain

"behind his eyes, since having a glaucoma test." (Id.) Plaintiff demanded "antibiotic ointment." (Id.) She found "no redness on d/c of eyes." (Id.) The following day, on August 9, 2001, Plaintiff again complained of an eye infection and demanded antibiotic ointment. She again found "no swelling or redness of the eyes." (Id.) Braskie concluded that the "patient does not need any Rx at this time, [there] is no apparent infection, patient accusing me of being part of a hate group, which is trying to make him go blind. Will refer to psych." (Id.)

On August 14, 2001, Braskie examined Plaintiff, who again complained of an eye infection and demanded antibiotics. (Defs.' Ex. C, Doc. 62-17 at 22.) Although Plaintiff complained of "swollen eyelids," it appeared to Braskie that Plaintiff was merely refusing to open his eyes. (Id.) On August 29, 2001, Braskie again examined Plaintiff. (Defs.' Ex. C, Doc. 62-16 at 23.) Plaintiff complained of "flashing of light in eyes." (Id.) The examiner found that the "retina [was] normal." (Id.) She further noted that there was "no medical explanation for patient's [complaint of] flashing." (Id.)

In support of Dr. Derose's contention that he did not have any contact with Plaintiff after the initial glaucoma test, he submitted a medical record showing that on October 2, 2001, about two months after the alleged botched eye test, "[Plaintiff] refused to be seen by Dr. Derose." (Defs.' Ex. C, Doc. 62-16 at 25.)

### B.      Allegations Against Tkach

On September 24, 2001, in connection with the above-mentioned eye injury, Plaintiff alleges that he was examined by Fran Tkach ("Tkach"), a lab technician at SCI Frackville. (Pl.'s Compl. 3, § b-c; Pl.'s Am. Br. Suppl. Mot. for Obj. to Derose Summ. J., Subpoena 1.) Plaintiff

further alleges that, while administering a blood test, Tkach intentionally injected a resistant bacteria into Plaintiff's arm. (Pl.'s Compl. 3, § b-c.) As a result, Plaintiff contends that he suffered a blood infection. Plaintiff alleges that subsequently he suffered an infection in his brain and an aneurysm that went untreated for two and a half months. (Id. at 3, § c.)

Tkach states that, at the time of Plaintiff's initial Complaint, she was a lab technician employed by Prison Health Services, a private corporation that provides medical services at SCI Frackville. (Def. Tkach Mot. Summ. J. 1.) She states that she has no recollection of having any contact with Plaintiff. (Id. at 13.) Further, Tkach states that even if she did perform a blood test on Plaintiff, any contact would have been limited to drawing blood, and not injecting anything into the patient. Tkach states that she did not have the requisite medical training to inject a substance into a patient, and that the processes of withdrawing blood and injecting a substance are different. (Id.)

As a result of the eye injury and botched blood test, Plaintiff asserts that he now suffers from serious illnesses. Plaintiff asserts that he suffers: numbness in his left arm; spasms in his left hand; a continuous flow of bacteria from the site of his aneurysm to his neck; dizziness; and thirty second losses of consciousness. (Pl.'s Mot. Inj. Relief. 1, 3.) He asserts that he suffers from terminal brain tumor(s). (Pl.'s Am. Br. Supp. Mot. for Obj. to Derose Summ. J. 15.) Due to the alleged brain tumor(s), Plaintiff asserts to suffer from migraine headaches and hears a pinging sound. (Pl.'s Mot. Inj. Relief. 1, 3.) He also asserts that he has a cancerous sore in the back of his neck. (Id.) Since his treatment (presumably referring to his visit with Tkach),

Plaintiff asserts that he suffers from anxiety, nightmares, stress, and hypertension.[7] (Pl.'s Am. Br. Supp. of Mot. for Rbttl. 10.)

Tkach has offered evidence that review of Plaintiff's medical records shows that he never suffered a blood infection, or an aneurysm. (Def. Tkach Mot. Summ. J. 6, 13.) Tkach further shows that medical records reveal that Plaintiff actually refused blood work for a two year period, approximately December 18, 2001 until December 18, 2003. (Id.)

On November 20, 2001, a registered nurse[8] noted that "Allegheny County Prison DON (Dennis) called to say that there was no significant abnormalities on lab tests there." (Defs.' Ex. C, Doc. 62-16 at 26.) That same day, Plaintiff requested antibiotics for "a blood infection." (Id.) The medical examiner concluded that inasmuch as there was normal blood work, there was "no reason for antibiotics at this time." (Id.)

On February 18, 2002, Dr. Nancy McGarvie, M.D. noted that Plaintiff was complaining of "having a brain infection [that] wasn't tested." (Defs.' Ex. C, Doc. 62-17 at 14.) On March 7, 2002, Dr. John Symons, M.D. informed the "patient that he does not have [a] 'brain infection.'" (Defs.' Ex. C, Doc. 62-17 at 13.) On June 5, 2005, a member of the prison medical staff noted, "[a]sked to see inmate by psychiatrist as inmate states he has an aneurysm. Nothing in his records about an aneurysm. He refuses to discuss any medical issues in the block - wants a private interview . . . I see nothing . . . that precludes treatment with anti-psychiatric meds. Even if he had an aneurysm, it still would not preclude treatment." (Defs.' Ex. C, Doc. 62-17 at 35.)

---

[7] An independent review of the medical records provided by Defendants did not reveal documentation of any of the ailments asserted by Plaintiff.

[8] The full name of the nurse is indecipherable. (Defs.' Ex. C, Doc. 62-16 at 26.)

IV.   **STANDARD FOR SUMMARY JUDGMENT**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a summary judgment as a matter of law." Celetox Corp. v. Catrett, 477 U.S. 317, 322

(1986); Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must

be both: (1) material, meaning concerning facts that will affect the outcome of the issue under

substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could

return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.  In reviewing a motion for

summary judgment, the court "does not make credibility determinations and must view facts and

inferences in the light most favorable to the party opposing the motion." Siegel Transfer, Inc. v.

Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).


V.   **DISCUSSION**

First, this court will examine whether Plaintiff has exhausted all available administrative

remedies, pursuant to 42 U.S.C. § 1997e(a).  Summary judgment is proper in this instance

because Plaintiff has failed properly to exhaust the three-tiered prisoner grievance system.

Second, in the alternative, even if Plaintiff were to have followed the proper administrative

channels, this court will examine whether Plaintiff has met the deliberate indifference to a

prisoner's serious medical need standard.  This court finds that summary judgement is proper in this instance because Plaintiff has failed to demonstrate that there is a genuine issue of material fact as to whether he has a serious medical need and whether Defendants were deliberately indifferent to that need.

### A.      Administrative Exhaustion

An inmate, such as Plaintiff, who wishes to pursue a cause of action based on any federal law or the United States Constitution must exhaust all administrative remedies before filing suit. 42 U.S.C. § 1997e(a).  Failure to comply with administrative procedures, including filing late appeals or a failure to file, bars a constitutional complaint.  See Woodford v. Viet Mike Ngo, 126 S. Ct. 2378, 2383 (2006).  The portion of 42 U.S.C. § 1997e that pertains to suits by prisoners provides in pertinent part:

> No action shall be brought with respect to prison conditions under 42 U.S.C. § 1983, or any other Federal Law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In Woodford, 126 S. Ct. at 2382, the United States Supreme Court stated that, under the Prison Litigation Reform Act ("PLRA"), exhaustion is not left to the discretion of the district court.  See Civil Rights of Institutionalized Persons Act, § 7(a); 42 U.S.C. § 1997.  Compliance with the exhaustion of administrative remedies requirement is mandatory.  See Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000).  The PLRA requires that prisoners exhaust all "available" remedies, not just those that meet federal standards.  Woodford, 126 S. Ct. at 2382-83.  Finally, under the PLRA, exhaustion of available administrative remedies is required for any suit

-13-

challenging prison conditions, not just for suits under § 1983.  Id.

At the time of Plaintiff's Complaint, the Department of Corrections of the

Commonwealth of Pennsylvania provided a three tiered grievance procedure for claims

concerning inadequate medical care.  The stated purpose of this grievance system is to "establish

procedures for the review of inmate grievance . . . [and to] ensure that an inmate has an avenue

through which resolution of specific problems can be sought."  DC-ADM804 (detailing the

grievance procedure).  First, an inmate has a right to file an initial review.  DC-ADM804, Part

VI.B.  Second, an inmate *may* file a first appeal from the initial review within ten working days

from the date of the initial review, known as an appeal to the facility manager.  DC-ADM804,

Part VI.C (emphasis added).  Finally, an inmate must file a final appeal to the Secretary's Office

of Inmate Grievances and Appeals.  DC-ADM804, Part VI.D; (see Defs.' Ex. C, Doc. 62-7 at 1-

18) (detailing the formal Policy Statement for the Inmate Grievance System).)

In Tkach's motion for summary judgment, she states without contradiction that Plaintiff

never filed a grievance against her on any ground, including allegedly giving him a blood

infection during the blood test. (Def. Tkach Mot. Summ. J. 6.)  In addition to failing to file an

initial review, Tkach also shows, without contradiction, that Plaintiff never filed an appeal from

the initial review to the facility manager at SCI Frackville.  (Id.)  Finally, Tkach asserts that

Plaintiff had the right to file a final appeal to the Secretary's Office of Inmate Grievances and

Appeals, but failed to exercise this right.  (Id.)

Dr. Derose admits that Plaintiff properly filed an initial grievance against him. (Defs.'

Ex. A, Doc. 62-4 at 13-14, 24-29; see also Def. Derose. Mot. Summ. J. 2-3.)  However, Dr.

Derose shows that Plaintiff never appealed the administrative response that rejected the initial

grievance on its merits. (Defs.' Ex. A, Doc. 62-4 at 32; see also Def. Derose. Mot. Summ. J. 2-3.)
Dr. Derose states, without contradiction, that Plaintiff never filed a final appeal to the Secretary's
Office of Inmate Grievances and Appeals.  (Def. Derose. Mot. Summ. J. 2-3.)

It is unclear from the formal Policy Statement for the Inmate Grievance System whether
the first appeal is required.  This ambiguity is a result of the wording of the rule that states: "An
inmate *may* appeal an Initial Review decision, or grievance restriction to the Facility Manager in
writing, within 10 working days form the date of the Initial Review decision or notice of a
grievance restriction." DC-ADM 804, Procedure VI.C.1(b) (emphasis added).  Notwithstanding
any possible ambiguity, the United States Supreme Court has ruled that, even if the first appeal is
not required under a formal policy, it is nevertheless required that the potential plaintiff comply
with all "available" administrative steps before availing himself of the federal court system.  See
Woodford, 126 S. Ct. at 2382-83, 2385 (noting that " [a]dministrative law requir[es] proper
exhaustion of administrative remedies, which means using *all steps that the agency holds out*,
and doing so properly, so that the agency addresses the issues on the merits." (emphasis added)
(citing Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002 )).

Because Plaintiff failed to exhaust the administrative remedies made available to him by
the Commonwealth of Pennsylvania, 42 U.S.C. § 1997e(a) bars Plaintiff's 42 U.S.C. § 1983
deliberate indifference claim.  Due to Plaintiff's failure to exhaust, this court does not have
jurisdiction to determine Plaintiff's claims as to their factual merit.  See Woodford, 126 S. Ct. at
2382 (noting that exhaustion requirements are no longer left to the discretion of the district court,
but are mandatory) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)).  Because Plaintiff failed
to exhaust the available administrative remedies, summary judgment is granted in favor of both

Defendants.

**B.      Plaintiff's Eighth Amendment Claim, Discussed As Alternative Ground for Summary Judgment.**

Where an inmate has <u>properly</u> exhausted the available administrative remedies, he is allowed to file a § 1983 suit in federal court.[9]  Here, even if Plaintiff had fully complied with the administrative scheme of 42 U.S.C. § 1997e(a), his claims do not rise to the level of deliberate indifference to serious medical needs.  The United States Supreme Court has held that prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment only when they act deliberately and indifferently to the serious medical needs of prisoners in their custody.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); <u>see</u> <u>also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).  An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious" <u>and</u> (2) the "prison official must have a sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834.

---

[9]  42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### 1.    The Objective Prong: Serious Medical Need

To meet the objective prong of the deliberate indifference test, the plaintiff must show the existence of a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The objective prong requires that the alleged injury be sufficiently serious in the sense that a condition of urgency exists, which may produce death, degeneration, or extreme pain.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  A medical need rises to the level of seriousness required by the Eighth Amendment if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth Cty. Correctional Inst. Inmates v. Lozano, 834 F.2d 326, 347 (3d Cir. 1987).

The serious medical need requirement is satisfied where denial or delay of medical care causes an inmate to suffer a life-long handicap or permanent loss.  See Monmouth Cty., 834 F.2d at 347 (citing Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir. 1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth"); see also Derrickson v. Keve, 390 F. Supp. 905, 907 (D. Del. 1975) (failure to perform elective surgery on inmate serving life sentence would result in permanent denial of medical treatment and render condition irreparable).

The serious medical need requirement was not satisfied where a prisoner was suffering from slight visual impairment that caused headaches.  See Borrelli v. Askey, 582 F. Supp. 512, 513 (E.D. Pa. 1984) (holding that prisoner failed to state an Eighth Amendment claim when he failed to establish visual deterioration or physical difficulties as a result of not having his prescription eyeglasses for several months).

Both Defendants sufficiently demonstrate medically that the conditions that Plaintiff alleges fail do not constitute life-threatening conditions, and do not cause the type of extreme pain required to meet the serious medical need requirement.[10] (Def. Derose Mot. Summ. J. 22; Def. Tkach Mot. Summ. J. 16.) This medical evidence is unrebutted.

Plaintiff contends that Dr. Derose committed a medical error by refusing to perform a CT-Scan of his brain. (Pl.'s Compl. App. 3.) However, a claim of medical negligence cannot be brought under § 1983. Although there is no evidence that Dr. Derose had any contact with Plaintiff after the glaucoma test, Plaintiff nevertheless claims that Dr. Derose refused to perform brain surgery on him. (Id.) Plaintiff further claims without medical evidence that brain surgery would have been necessary in order to alleviate the alleged aneurysm caused by the alleged bacteria injection by Tkach. (Id.) Plaintiff asserts without medical evidence that there are "positive" blood and urine tests on record in SCI Huntingdon. (Pl.'s Mot. for Obj. to Mot. Summ. J. 14.) Plaintiff asserts without medical evidence that these tests are evidence of Plaintiff's tumor, which he would offer at trial. (Id.)

Plaintiff submits that Tkach is spuriously denying recollection of the above-mentioned blood test. (Pl.'s Am. Br. Supp. of Mot. for Rebttl. 6.) Plaintiff asserts that he would call Registered Nurse Carol ("RN Carol") as a witness. He asserts that she scheduled the blood test

---

[10] Dr. Derose and Tkach also argue that summary judgment should be granted because Plaintiff has failed to offer expert testimony to establish that serious medical need did exist. (Def. Derose. Mot. Summ. J. 22; Def. Lab Tech. Fran Mot. Summ. J. 14.) Defendants cite to Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d. Cir 1987), as requiring, in certain situations, that a prisoner bringing a deliberate indifference to a serious medical claim produce expert testimony to establish the existence of medical need. Expert testimony is required when a lay jury lacks the ability to determine whether a serious medical need exists. Id. at 473. Because the court grants summary judgment on other grounds, this issue is not reached.

in question. (Id. at 7.)  However, there is no suggestion that RN Carol saw the procedure

allegedly performed.  In support of his contention that the blood test actually took place, Plaintiff

would propose to call unnamed witnesses[11] who are claimed to have been interviewed by SCI

Frackville security regarding the incident.  (Id.)

Concerned about his allegedly worsening medical conditions, Plaintiff requests that he be

transferred to Graterford Hospice Unit.[12]  (Pl.'s Mot. Injct. Relief. 3.)  Plaintiff asserts that he has

been denied necessary medication for his above-mentioned conditions, and that he would receive

treatment, clean medicine, and food if he were transferred.  (Id. at 5.)  Plaintiff repeatedly

requests that a CT-Scan be performed on his head.  (Id.)  Plaintiff asserts that, without CT-Scan

results, there is a genuine issue of material fact that militates against this court granting the

motions.  (Pl.'s Mot. Rbttl. App. 1.)  Plaintiff asserts that the CT-Scan results would show the

extent of the damage that Dr. Derose and Tkach caused.  (Pl.'s Mot. Injct. Relief. App. 2.)

This court finds that Plaintiff has failed to produce sufficient evidence to establish the

---

[11] Plaintiff states that the Security Captain at SCI Frackville conducted an investigation
on the grievance.  (Pl.'s Mot. for Obj. to Mot. Summ. J. 20.)  Plaintiff asserts that the fact that the
Security Captain was not permitted to testify creates a material issue of fact that militates against
this court granting the Defendants' motions.  (Id.)  This is without merit.  The Captain would
have no first-hand knowledge of what occurred.

Plaintiff asserts that he can call several expert witnesses on other Prison Health Services
cases.  (Pl.'s Am. Br. Supp. of Mot. for Rbttl at 14.)  Plaintiff does not identify by name any
reasonable experts.  Plaintiff plans to call Ms. Jean Gauker, of Graterfriend Newsletter, and the
Editor of the Philadelphia Inquirer.  (Id.)

[12] Plaintiff cites the need to be transferred to a hospital unit.  (Pl.'s Am. Br. Supp. of Mot.
for Rbttl. 10.)  Apparently, Plaintiff is now denied access to a bed pan due to concern that he was
collecting his feces to throw at guards.  (Id.)  Plaintiff is concerned about his lack of access to a
bed pan.  (Id.)  Here again, Plaintiff's assertions are not cognizable because they are not being
made as to the remaining Defendants and are without medical support.  These assertions
therefore must be treated as spurious.

existence of his serious medical need. Plaintiff has produced no medical records documenting the complained of ailments that form the basis for this suit. Defendants have submitted voluminous medical and prison records on Plaintiff. These medical records reveal no documentation of Plaintiff having suffered an aneurysm or blood infection.[13]

Prison medical personnel determined that Plaintiff's conjunctivitis was not grave enough to warrant prescription medicine. (Defs.' Ex. C, Doc. 62-16 at 20.) Plaintiff has not met his burden and shown that conjunctivitis, the only condition of record, is a condition of urgency, which may produce death, degeneration, or extreme pain. See Hathaway, 99 F.3d at 553; Monmouth Cty., 834 F.2d at 347; Borrelli, 582 F. Supp. at 513. Plaintiff did recover from his conjunctivitis. Because Plaintiff recovered, for whatever reason, within a short time from this condition he cannot claim an Eighth Amendment violation. Plaintiff's conjunctivitis does not rise to the level of serious medical need.

## 2.    The Subjective Prong: A Culpable State of Mind

The subjective prong requires that the charged official must act with a sufficiently culpable state of mind. See Nami v. Fauver, 82 F.3d 63, 67 (3d Cir. 1996) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Deliberate indifference is possible whether "the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

---

[13] Rather, Plaintiff allegedly suffered from conjunctivitis, which, according to Dr. Derose's unrefuted medical opinion, could have been self-inflicted when he applied an unprescribed substance directly to his eyes, and for which he rejected medical treatment. (Defs.' Ex. A, Doc. 71 at 29; Defs.' Ex. C, Doc. 62-17 at 23; Pl.'s June 13, 2007 statements.)

In the medical context, deliberate indifference falls somewhere between negligence on the one end of the culpability-spectrum and purpose or knowledge on the other. Farmer v. Brennan, 511 U.S. 825, 836 (1994). Deliberate indifference is equated with recklessness. Id. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837; see Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (noting that in order to be liable for deliberate indifference, the prison official must know of and also disregard an excessive risk to inmate health or safety).

The Farmer Court states that where a prison official has been charged with deliberate indifference he may defend that he "did not know of the underlying facts indicating a sufficiently substantial danger and that [he was] therefore unaware of a danger, or that [he] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. A complaint that a physician has been negligent does not state a valid claim of medical mistreatment under the Eighth Amendment. Estelle, 429 U.S. at 106. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Id.

Defendants argue that Plaintiff failed to show that either party knew of, or disregarded a risk, that they would cause harm to Plaintiff. In Dr. Derose's affidavit, the doctor stated that he performed a routine glaucoma test on Plaintiff, and did not put a harmful substance in Plaintiff's eyes. (Defs.' Ex. A, Doc. 71 at 27; see Def. Derose Mot. Summ. J. 17.) Thus, Dr. Derose's unrebutted medical opinion is that he put a substance that was not harmful and was not intended

-21-

to be harmful into Plaintiff's eyes.  (Id.)  Because Dr. Derose merely put Floress eye drops into

Plaintiff's eyes, and without evidence to the contrary, Plaintiff has failed to show that Dr. Derose

harbored the requisite intent to harm Plaintiff.  (Id.)

Dr. Derose, in his unrebutted medical opinion, stated that the chemicals that he used on

Plaintiff have never been known by the doctor to cause any adverse reaction in any previous

patients.  (Defs.' Ex. A, Doc. 71 at 27.)  Thus, Dr. Derose also lacked a reckless or negligent

state of mind, in that he did not knowingly disregard a risk that the eye drops may have adverse

affects.

In addition, Dr. Derose raises causation concerns.  Dr. Derose notes that Plaintiff put a

dangerous substance in his own eyes, which, in Dr. Derose's unrebutted medical opinion, could

have caused the complained of conjunctivitis.  (Defs.' Ex. A, Doc. 71 at 29.)  During the June 13,

2007 pretrial conference, Plaintiff admitted to grinding up a Bactrum antibiotic pill, that he

obtained from a fellow inmate, and putting the granules into his eyes.  (Id.)  Because Plaintiff

placed the harmful substance into his eyes himself, Dr. Derose could not have had the requisite

culpable state of mind to either present or disregard a substantial risk of causing harm to

Plaintiff's eyes.  (Id.)

In Dr. Derose's affidavit, he stated that after the eye examination, Plaintiff refused to be

seen by the doctor, and as such, Dr. Derose was not involved in Plaintiff's treatment.  (Defs.' Ex.

A, Doc. 71 at 29; see also Def. Derose. Mot. Summ. J. 2-3.)  In support of Dr. Derose's

contention, medical records reveal that on October 2, 2001, about two months after the alleged

botched eye test, "[Plaintiff] refused to be seen by Dr. Derose."  (Defs.' Ex. C, Doc. 62-16 at 25.)

Dr. Derose was unaware of any injury from which Plaintiff may be suffering.  (Defs.' Ex. A,

-22-

Doc. 71 at 28.)  Plaintiff failed to complain of any adverse symptoms directly to Dr. Derose. (Id.)  Because of the established protocol for sick call within the correctional facility, Dr. Derose would not have been notified of any adverse symptoms.  (Id.)  Since Dr. Derose was not aware of Plaintiff's post-glaucoma test care, he could not have intentionally denied or delayed Plaintiff's access to medical care.  This court finds that Plaintiff has produced no evidence to suggest that the manner in which Dr. Derose administered the glaucoma test or responded to the alleged subsequent eye irritation establishes the doctor's deliberate indifference.

Tkach argues that Plaintiff bases his claim of deliberate indifference on his belief that the technician shot a resistant bacteria into his blood, thus causing Plaintiff harm.  (Def. Tkach Mot. Summ. J. 13.)  Plaintiff argues that Tkach intentionally caused him harm during the blood test. (Id.)  In response, Tkach notes that there is no evidence that she ever had any contact with Plaintiff.  (Id.)  At most, Tkach acknowledges that she may have drawn blood from Plaintiff. But, because the technician only had the ability to withdraw blood, Tkach argues that it would be impossible for her to affirmatively shoot anything into Plaintiff's blood stream.  (Id.) Accordingly, Tkach lacked substantial knowledge that her conduct (or omission) presented a substantial risk of harm to Plaintiff.  Due to Tkach's lack of knowledge, she did not have the ability to act with the sufficiently culpable state of mind.

This court finds that Plaintiff has failed to produce sufficient evidence to raise a genuine issue of material fact as to whether Dr. Derose or Tkach had the requisite subjective knowledge that medical conduct they engaged in, or failed to engage in, would cause harm to Plaintiff. Deliberate indifference to serious medical need is shown when prison officials have *denied* an inmate recommended treatment or *delayed* necessary medical treatment for nonmedical reasons.

-23-

Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  Rather than disregarding Plaintiff's medical needs, Plaintiff's medical records show that Plaintiff received appropriate medical attention and care after the conjunctivitis diagnosis.  First, after complaining of eye discomfort, Plaintiff was timely examined.  (Defs.' Ex. C, Doc. 62-16 at 19.)  That Plaintiff received a medical examination the day after the allegedly mishandled glaucoma test is evidence that prison medical staff neither prevented or delayed Plaintiff's access to adequate medical care, and thus, could not have disregarded an excessive risk to the prisoner's health or safety.[14]  (Id.)

Second, in addition to receiving timely medical examinations, Plaintiff himself stated, at the June 13, 2007 pretrial conference, that he refused "mineral oil" that was offered to alleviate eye irritation, due to his fear that the medication had been tampered with.  It is dispositive that Plaintiff refused medical care after complaining of eye irritation.  Plaintiff's refusal to cooperate with medical personnel is evidence that prison medical staff did not act recklessly because the staff did not delay or deny medical care to a patient that had a serious medical need.

Plaintiff's pattern of requesting and refusing medical care is likely due to his psychiatric condition, with documented symptoms of "inappropriate health seeking behavior." ( Defs.' Ex. C, Doc. 62-16 at 15.)  Plaintiff has a well documented prison medical history of refusing medications, lab work, and general medical care.  (See, e.g., Defs.' Ex. C, Doc. 62-11 at 39-45, 58 (showing that Plaintiff repeatedly refused to sign waivers that provide that "by refusing the medication prescribed to me, problems could arise that could cause exacerbation of my mental health status").)

---

[14]  As mentioned above, after the timely medical examination, Prison medical personnel determined that Plaintiff's conjunctivitis was not grave enough to warrant prescription medicine. (Defs.' Ex. C, Doc. 62-16 at 20.)

Plaintiff's assertions about medical issues at this stage cannot be taken as medical opinion, and cannot survive the summary judgment stage.  There is no reason to relax the summary judgment standard for Plaintiff, given that he has had the opportunity to develop evidence in support of his claims.  There is nothing in the record that shows he has a brain aneurysm or any other alleged serious medical condition.

A ruling of summary judgment is proper on the merits because Defendants have shown that there is no genuine issue of material fact as to Plaintiff's unsubstantiated allegations of deliberate indifference to serious medical need.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions for summary judgment are granted.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HALGER M. POTTER,                          :      CIVIL ACTION
                                           :
                    Plaintiff,             :      NO. 03-04735
                                           :
        v.                                 :      **FILED**
                                           :
DEPUTY ATTORNEYS UNDER                     :      FEB 1 2 2008
LYNN ABREHAM, et al.,                      :
                                           :      MICHAEL E. KUNZ, Clerk
                    Defendants.            :      By_____Dep. Clerk

## ORDER

AND NOW, this 11th day of February, 2008, upon consideration of Defendant

Fran Tkach's (a.k.a. "Lab. Tech. Fran.") Motion for Summary Judgment (Doc. No. 63) and

Defendant Dr. David Derose's Motion for Summary Judgment (Doc. No. 71), and Plaintiff

Halger M. Potter's Responses in opposition thereto, it is hereby ORDERED that said motions are

GRANTED for the reasons set forth in the attached Memorandum.  Accordingly, judgment is

entered in favor of each Defendant and against Plaintiff on all counts.  Any remaining pending

motions are DENIED AS MOOT.  The above-captioned matter is DISMISSED.  The Clerk of

Court shall mark the above-captioned matter as CLOSED for all statistical purposes.

BY THE COURT:

JAMES T. GILES      J.